Filed 6/27/25  P. v. Hartwell CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>TEDDY KAISER HARTWELL,<br><br>        Defendant and Appellant. | D085452<br><br><br>(Super. Ct. No. INF2300006) |

APPEAL from a judgment of the Superior Court of Riverside County, Charles J. Koosed, Judge.  Affirmed.

Kenneth H. Nordin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel and Tami Falkenstein Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

A jury convicted appellant Teddy Hartwell of burglarizing the homes of six families over a period of several weeks in April 2021. Among the evidence linking Hartwell to the burglaries were shoe prints found at or near some of the victims' homes that matched shoes found in Hartwell's vehicle, as well as various victims' personal property that officers found in the car and Hartwell's home following his arrest.

On appeal, Hartwell contends the trial court erred in denying his motion to suppress statements he made at the police station after his arrest that tended to place him near some of the crime scenes at the time of the burglaries. According to Hartwell, the officer violated his *Miranda*[1] rights by failing to either end the interview or ask solely clarifying questions when Hartwell made a reference to an attorney early in the interview. Hartwell also argues the judgment must be reversed because the prosecutor erroneously presented evidence that made mention of his use of a gun in connection with evidence of prior similar crimes admitted under Evidence Code section 1101, subdivision (b), despite the trial court's ruling prohibiting any reference to firearms in connection with that evidence.

We find no merit in Hartwell's arguments and therefore affirm the judgment.

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

A.   *Factual Background*

Hartwell was charged with six counts of residential burglary stemming from six separate home invasions that took place in the Rancho Mirage area of Riverside County during April 2021.  The evidence as to each burglary count is recounted below, along with a summary of additional evidence admitted at trial.

1.   *The April 6 Burglary (Count 1)*

Diana J. lived with her husband Douglas J. in a gated community in Rancho Mirage.  On the morning of April 6, 2021, they awoke to discover someone had been inside their home overnight and rummaged through their things.  They found the door to their garage left open, a car door was open, cupboards throughout the home were open, and someone had cut a hole in one of their screen doors.  The couples' home security system indicated that the interior door between the garage and laundry room had been left ajar at 2:00 a.m.

Among the items missing from their home were Diana's purse, a jewelry box, and Douglas's money clip, which had cash, credit cards, and a driver's license in it.  The jewelry box was found dumped outside, as was Diana's purse.  Her cash, credit cards, driver's license, and coin purse were missing from the purse, however.  Diana was alerted by email from one of her credit card issuers that someone had attempted to use a credit card at a gas station in Indio, California at 2:17 a.m. on April 6, 2021.

Police officers were able to obtain surveillance video from the gas station where someone attempted to use Diana's credit card. At the time Diana's credit card was declined at a pump, the video showed a dark-colored vehicle at the gas station. A Chevrolet Malibu with license plate 8RZF371 was identified by a license plate reader located at an intersection approximately one mile from the victims' home at approximately 11:33 p.m. on April 5, 2021. Investigators determined the Malibu had been rented by someone named Sandra Barton, and Hartwell was listed as an additional driver on the rental contract.

2. *The April 7 Burglary (Count 2)*

Heather P. and Herbert N.'s home in a gated community in Rancho Mirage was burglarized overnight between April 7 and April 8, 2021. Heather and Herbert found the drawers in a closet pulled out and turned upside down. An expensive wallet containing $1,000 cash had been taken out of Heather's purse, and a jeweled watch band was separated from the watch face and taken. In addition, a small handgun was taken.

Security footage from the nearby Westin Mission Hills showed the Chevrolet Malibu entering the gated community where Heather and Herbert lived at 11:44 p.m. on April 7 and leaving at about 12:22 a.m. on April 8. The Malibu was also spotted by a license plate reader near the gated community at 11:34 p.m. on April 7.

3. *The First April 15 Burglary (Count 3)*

On April 15, 2021, a Riverside sheriff's community service officer was dispatched to an area in Rancho Mirage in response to a call about women's purses that were found in a bush. The bush was located near the home of Margie and Donald B., and Margie identified one of the purses as belonging to her. The credit cards that had been inside the purse were missing.

4

Officers conducted an inspection of the couple's residence and determined that an intruder had entered the home through a sliding door that opens to an area abutting a golf course.

4. *The Second April 15 Burglary (Count 4)*

That same morning, April 15, 2021, John and Michelle B., who lived on the same street as Margie and Donald, awoke to find their home had also been burglarized overnight. Their patio screen door was left partially open, and drawers were open in most of the rooms, including the room in which the couple had been sleeping. A cell phone and gold earrings were missing.

A license plate reader recorded the Malibu approximately a mile from John and Michelle's home at about 12:15 a.m. the morning of April 15, 2021. And surveillance video from a home not far from both John and Michelle's home and Margie and Donald's home showed a Malibu parked near the victims' residences at around 12:45 a.m. on April 15, 2021.

5. *The April 29 Burglary (Count 5)*

On the night of April 29, 2021, Dennis and Linda B. were hosting their daughter Denise and her husband Ernesto for an overnight visit at their home in a gated community in Rancho Mirage. At some point after 10:00 p.m., Ernesto was getting ready for bed and he walked into the kitchen to get a glass of water. At that point, Ernesto saw a man wearing a black hoodie and a mask going through things on the kitchen counter. Ernesto yelled at the man and tried to grab him, but the man was able to escape through a sliding door while carrying away Linda's purse. In addition, Dennis's money clip, which had approximately $400 cash in it, was missing from a bowl in the kitchen.

5

6.   *The Early Morning April 30 Burglary (Count 6)*

Renee S. and Sanford A. lived just down the street from Dennis and Linda in the same gated community. In the early morning hours of April 30, 2021, Renee awoke to find the sliding back door open and her purse missing. Later that day, someone found Renee's purse on the golf course on which her home was located. It was missing $20.

Arturo R. lived across the street from Renee and Sanford. At around 10:40 p.m. the night of April 29, 2021, his security system indicated there was movement around his home. Arturo checked his security cameras and saw an unknown person, wearing a mask and gloves, trying to gain entry to his home. Arturo called police, and an officer responded to the scene. The officer found that two screens had been removed from two windows, and the screen to the sliding glass door to the patio was left open, but the door itself was still closed and locked. The officer found a shoeprint on an air conditioning unit located next to one of the windows where a screen had been removed.

7.   *A Security Officer Witnesses Unusual Activity On April 29*

Overnight between April 29 and 30, Angelica M. was working as a security guard at the Forest Lawn Mortuary, which also had a mini-storage business on site. The mortuary and mini-storage business were located across the street from the homes burglarized or almost burglarized the night of April 29 and early morning of April 30.

At 10:22 p.m. on April 29, Angelica noticed a silver Ford Mustang parked in the parking lot of the mini-storage business. She found it unusual because it was "way past the hour for any vehicle to be there normally." She walked around the vehicle and looked to see if anyone was near it because she planned to ask the individual to leave. Angelica took photographs of the

6

vehicle, noted the license plate number, and then left to continue her patrol. At 11:43 p.m., Angelica returned to where the Mustang was parked. This time she saw an individual "with" the Mustang. She advised the man he was on private property and needed to leave, and he did so without incident.

An officer who had responded to the burglary calls in the area inspected the area where Angelica had seen the Mustang parked. The officer observed shoe impressions in a sandy area next to where the Mustang had been. The shoeprints that were left in the mini-storage parking area were later matched with the shoeprint that had been left on the air conditioning unit at Arturo's home. They also matched shoeprints officers found in a wash behind the homes that were burglarized or had suffered an attempted burglary in the overnight hours between April 29 and April 30.

8.    *Hartwell's Arrest and Further Investigation*

At approximately 2:00 a.m. on April 30, 2024, a Palm Springs police sergeant recognized a silver Mustang as one for which a "BOLO" or "be on the look out" had been issued. The Mustang's driver had been identified as the suspect in connection with crimes that had been committed in the Riverside Sheriff's jurisdiction. The police sergeant conducted a traffic stop of Hartwell, the Mustang's driver, as he was leaving a gas station. The officers initially held Hartwell at gunpoint, and he complied with their directions. The Palm Springs police then turned him over to the Riverside Sheriff's office.

Riverside County Sheriff's Department officers conducted a search of the Mustang pursuant to a warrant. Officers found two money clip wallets in the vehicle, as well as a backpack containing a tablet and cellular phone. A black ski-mask and shoes were found in the vehicle's trunk. The shoes matched the footprints officers had found on the air conditioning unit, in the

7

wash behind the burglarized homes, and in the mini-storage parking lot near the burglarized homes where Hartwell's Mustang had been parked.

When investigators searched Hartwell's apartment, they recovered the wallet of one of the burglary victims, as well as a debit card belonging to another victim.

9.      *Hartwell's Prior Convictions for Similar Offenses*

On January 22, 2016, victim Rodney T. was living in Palm Springs when he awoke to find Hartwell standing in his kitchen. Hartwell was dressed in black jeans and a black hoodie, and wore a black bandana across his face. Rodney began yelling and ran toward Hartwell. Hartwell grabbed Rodney's wallet and cell phone off the counter and ran out the back door. Rodney began chasing Hartwell, but eventually gave up and called 911. At trial, the parties stipulated to informing the jury the trial court had "taken judicial notice that on July 11th, 2016, Teddy Hartwell pled guilty in Riverside County case Number INF1670035 to entering a residence [in Palm Springs and] committing a theft on January 22nd, 2016."

On the morning of March 10, 2016, a Riverside Sheriff's deputy responded to a call from victim Monica Y. about a burglary that had taken place in the City of Rancho Mirage. Monica believed someone had entered her home and taken some of her belongings. The deputy observed an open window and open door in the house, and then found some of Monica's belongings, including a purse, wallet, drawer from a jewelry box, behind a wall located at the rear of her residence. The parties stipulated to informing the jury the trial court had "taken judicial notice of the fact that on July 11th of 2016, Teddy Hartwell pled guilty in Riverside County Case Number INF1670121 to entering the residence [in Rancho Mirage], and committing a theft on March 10th of 2016."

B.    *Procedural Background*

Hartwell was charged by amended complaint with six counts of residential burglary (Pen. Code,[2] § 459; counts 1-6).[3]  The operative charging document also alleged that someone other than an accomplice was present in the residences during the commission of the crimes (§ 667.5, subd. (c)(21)), and that Hartwell had suffered two prior strike convictions (§§ 667, subds. (c), (e)(1); 1170.12, subd. (c)(1)) and two serious felony priors (§ 667, subd. (a)).  The existence of several aggravating factors was also alleged.

A jury trial on the amended complaint commenced in late August 2023.  The jury convicted Hartwell on all six burglary counts on September 5, 2023.  He admitted the prior conviction allegations, as well as the aggravating factor allegations.

On November 3, 2023, the trial court sentenced Hartwell to a total term of 150 years to life.  That term was composed of six indeterminate terms of 25 years to life on counts 1 through 6, plus a concurrent determinate term of 32 months on count 7.  The court struck punishment for the serious felony prior allegations.

---

[2]    Further statutory references are to the Penal Code unless otherwise indicated.

[3]    Hartwell was originally charged with six counts of residential burglary (counts 1-6) and one count of unlawfully receiving stolen property (§ 496, subd. (a); count 7).  Hartwell was tried on those seven counts in June 2023.  The jury convicted Hartwell on the receiving stolen property count but was unable to reach unanimous verdicts on the six burglary counts.  The information was subsequently amended, but continued to charge the six counts of residential burglary and still erroneously included the seventh count for receiving stolen property, despite the fact that Hartwell had been convicted on that count.

DISCUSSION

A.  *The Trial Court Did Not Err in Denying Hartwell's Motion to Suppress*

Hartwell contends the trial court erred in denying his motion to suppress his police station interview with Riverside County Sheriff's Sergeant James Mills.  According to Hartwell, the trial court improperly analyzed the issue involved in the motion to suppress by failing to conclude that Sergeant Mills had a duty to clarify what Hartwell contends was an "initial invocation of his right to counsel under *Miranda*."  As we explain, we disagree with the premise of Hartwell's argument and conclude the trial court ruled properly on Hartwell's motion to suppress.

1.  *Additional Background*

During trial, defense counsel moved to exclude Hartwell's interview with Sergeant Mills, arguing Hartwell invoked his right to have counsel present at the interrogation before Sergeant Mills advised him of his *Miranda* rights.  The court held a hearing under Evidence Code section 402 to learn more about the underlying facts of the interview.  Sergeant Mills testified, and the court admitted the audio of Sergeant Mills's interview with Hartwell, as well as a transcript of the interview.

Sergeant Mills testified that he interviewed Hartwell on April 30, 2021, following Hartwell's arrest.  When Sergeant Mills initially introduced himself by name to Hartwell, he asked, "How you holding up so far, man?"  Hartwell began complaining about his arrest and about "sitting in the car for about two hours and then get[ting to the station] and it's the same shit."  Sergeant Mills then removed Hartwell's restraints, and somewhat jokingly engaged

with Hartwell about the fact that Hartwell was no longer restrained.[4] Hartwell declined Mills's offer of food, saying "I'm not even hungry," but accepted the offer of coffee. Mills then introduced himself to Hartwell, indicating he "work[s] for the county obviously." Mills told Hartwell he had been called into the station because of a call that had been made to police about a suspicious person. Mills then asked Hartwell some basic biographical information, such as his full name, what name he goes by, and his birthdate.

After Hartwell provided his birthdate, Mills repeated it back to Hartwell, and Hartwell then said, "Yeah. 'Cause, yeah, I was, I was getting pissed dude to where I was gonna,—the other guy was kinda rude and I was gonna tell him like dude, if you guys can't tell me why I'm here, if I'm getting arrested, then I'm gonna call my dad so I can call my lawyer just to get the fuck out of here, then you guys can let me know. I was getting frustrated dude."[5] As Hartwell was talking, Mills made various statements indicating he was listening to Hartwell, such as "Yeah," and "I got you, man," and "Yeah. I got you."

---

[4] For example, Mills said at one point, "You know I don't recommend trying to run away when you're in the police station. We've had people do it in the past—[¶] . . . [¶] yeah. It doesn't, it doesn't work out too well, you know. Typically, by the time you're in the police station, you're not getting away too much. You know what I mean?"

[5] The written transcript of the interview varies in minor, non-substantive ways from the formulation we quote here, which is based on our review of the audio recording of the interview. Because the court admonished the jury that the audio recording constituted the evidence of Hartwell's interview, where there are slight differences between the audio recording and the written transcript, we rely the audio recording.

After Hartwell said, "I was getting frustrated, dude," Mills responded, "And, and, and, yeah, I, I understand that. You know, you, you had a long night. Nobody likes being put in the back of a cop car, drug around, not told any fuckin' questions—" Hartwell then said, "[D]ude, it was just the way it happened, dude."

Hartwell continued to relate how his night had been interrupted by his arrest, and complaining about how officers had drawn guns on him and told him not to "do nothing stupid or we'll, we'll shoot." Hartwell mumbled, while Mills apologized about how things had occurred and then changed the subject to ask Hartwell where he was residing. Mills continued to talk with Hartwell, making small talk and asking him biographical information. Mills eventually began to ask Hartwell about the kind of car he was currently driving, as well as other cars he had been driving recently.

Mills then asked if Hartwell had ever been arrested before, and Hartwell conceded had had just "got off parole and all that." At that point, Mills explained, "So, but because you, you've been arrested before, you know, before I ask questions, because right now you're not free to go. Okay. Um, I think they made that pretty obvious when with the ways your night has gone so far. So I would like to get some clarity to this but before I ask you questions, because you're not free to go, I have to advise you of your *Miranda* rights. Do you recall what those are?" Hartwell, responded, "Yeah." Mills further explained, "So right now, technically, you are in custody and then I'm going to ask you questions about what happened tonight. So that is where *Miranda* applies, so I have to read you these things and then after we're done reading those, like I said, my whole goal here is to just get some clarity for both of us. Okay. So, after I'm done reading you those, then we'll go from there. Obviously you know your options 'cause like you said, you've been

down this road before, you know. And you know how the process will go either way."

Before Mills was able to read Hartwell his *Miranda* advisements, however, Hartwell interrupted and asked, "[C]ould I say something? You said that someone called and said I, I didn't belong . . . ." Mills explained that police had been called to check on some homes where "somebody" had been where they did not belong. He then advised Hartwell of his rights under *Miranda*, and asked Hartwell whether he understood them. Hartwell indicated he did, and Mills said, "Okay. So, you were telling me you were at the casino." Hartwell proceeded to answer Mills's questions without hesitation.[6]

Hartwell did not confess to the burglaries during the interrogation. However, he did admit to certain facts that placed him in the areas where the crimes occurred, thereby tending to corroborate other evidence investigators had obtained that indicated his involvement in the crimes. For example, Hartwell answered questions about why the car he had been driving was recorded on traffic cameras near some of the burglarized homes during the times those burglaries occurred. Hartwell said he was in the area to go swimming, thereby effectively conceding he was near some of the victims' homes at the time of the crimes.

At the end of the evidentiary hearing, defense counsel argued that Hartwell had invoked his right to counsel when he said he wanted to call his dad in order to call his lawyer. According to defense counsel, Sergeant Mills should have at that point either allowed Hartwell to call his dad or sought

---

6    The transcript of this conversation from the point immediately after Mills gave the *Miranda* advisements through its conclusion comprises approximately 80 pages.

13

clarification from him. Defense counsel also asserted that Hartwell did not knowingly, willingly, or intelligently waive his rights following Sergeant Mills's *Miranda* admonition. According to counsel, Hartwell's "kind of more of a uh-huh kind of reply" was insufficient to register a knowing and intelligent waiver of those rights. For those reasons, trial counsel argued, *all* statements Hartwell made to Sergeant Mills should have been suppressed.

The prosecutor argued that *Miranda* rights cannot be asserted prior to the commencement of an interrogation and statements like the one Hartwell made have been held to be an insufficient invocation of an individual's *Miranda* rights.

The trial court determined Hartwell's purported invocation was ambiguous, explaining:

> "I think he could have invoked [*Miranda*] at that time, but I think his invocation is ambiguous. It's not unambiguous, and here's why. . . . Case law talks about invoking *Miranda* in an unambiguous way to the point where the officer would reasonably understand that that's what the defendant is doing, and it has to be with respect to *Miranda*. And here's the nuance in all of this. He's not—he's not saying he wants a lawyer before talking to anybody. He's saying he wants a lawyer to get out of jail. That's—that's a huge distinction under case law. [¶] . . . . It's very clear on page 6, starting at line 18 when the defendant says 'I want to call my dad so I can call my lawyer.' Mills says, 'I got you, man.' Defendant says, "Just to get the fuck out of here.' That had nothing to do with *Miranda*. And there's cases that—pretty close on point that it needs to be, otherwise it's ambiguous."

14

The court explained that it understood the law as requiring a request for counsel to be "unambiguous in a very particular sense," such "that a reasonable officer would know that the defendant's request for counsel was unequivocal for purposes of interrogation." The court discussed several cases and then repeated that Hartwell's statement was ambiguous, and, "[m]oreover, he continue[d] to talk," thereby indicating he was not interested in having an attorney present in order to talk with Mills. The court also ruled that Sergeant Mills gave the appropriate *Miranda* warnings, and the record sufficiently reflected Hartwell understood his rights and waived them. The trial court admitted Hartwell's full interview with Mills.

2. *Analysis*

Hartwell contends that by saying the words "so I can call my lawyer" in the earliest stages of his conversation with Mills he ambiguously invoked his right to the assistance of an attorney under *Miranda*, requiring the suppression of his statements to Mills. According to Hartwell, under the rule announced in *United States v. Rodriguez* (2008) 518 F.3d 1072, 1080 (*Rodriguez*) and *People v. Duff* (2014) 58 Cal.4th 527 (*Duff*), Mills had only two options available to him once Hartwell made an ambiguous invocation of the right to have counsel present during the interview: (1) stop talking with Hartwell, or (2) ask only clarifying questions to better ascertain whether Hartwell was indeed invoking his *Miranda* right to have an attorney present during his interrogation. According to Hartwell, because Mills continued to talk with him instead of doing one of those two things, anything said after this invocation should have been suppressed. As we explain, we disagree with Hartwell's contention.

15

"Concerned that 'without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures' that might lead an accused person to make statements in derogation of his or her Fifth Amendment privilege against self-incrimination, the United States Supreme Court, in *Miranda*, required law enforcement agencies to advise the accused of certain rights and to honor the accused's exercise of those rights. (*Miranda, supra*, 384 U.S. at p. 467.) Specifically, the accused must be warned 'prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires.' " (*People v. Gonzalez* (2005) 34 Cal.4th 1111, 1122 (*Gonzalez*).)

"In *Edwards v. Arizona* (1981) 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 [(*Edwards*)], the court added 'a second layer of prophylaxis for the *Miranda* right to counsel.' " (*Gonzalez, supra*, 34 Cal.4th at p. 1122.) *Edwards* held that "an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." (*Edwards, supra*, 451 U.S. at pp. 484–485.)

A statement obtained in violation of a suspect's *Miranda* rights may not be admitted to establish guilt in a criminal case. (*People v. Sims* (1993) 5 Cal.4th 405, 440.) "In reviewing the trial court's denial of a suppression motion on *Miranda* and involuntariness grounds, ' " 'we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently

16

determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' " ' [Citations.] Where . . . an interview is recorded, [however,] the facts surrounding the admission or confession are undisputed and we may apply independent review." (*Duff, supra,* 58 Cal.4th at p. 551.) California courts review issues concerning the suppression of a defendant's statements on *Miranda* grounds under federal constitutional standards. (*People v. Nelson* (2012) 53 Cal.4th 367, 374.)

Hartwell's contention that his comment about calling his father so he could call his lawyer constituted an ambiguous invocation of his right to have an attorney present at the interrogation requires consideration of the rules for interpreting asserted invocations of *Miranda*'s right to counsel. The purpose of the *Miranda-Edwards* guarantee is to "protect . . . the suspect's 'desire to deal with the police only through counsel.' " (*McNeil v. Wisconsin* (1991) 501 U.S. 171, 178 (*McNeil*), quoting *Edwards, supra,* 451 U.S. at p. 484.) Because of this, the invocation of one's right to counsel for purposes of *Miranda*'s protections occurs "only when the suspect 'ha[s] *expressed*' his wish for the particular sort of lawyerly assistance that is the subject of *Miranda*." (*McNeil,* at p. 178.) Consequently, an invocation of *Miranda*'s protections "requires, at a minimum, *some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police*." (*Ibid.*, italics added.)

When considering whether a suspect has invoked the right to counsel—i.e., whether he has expressed a desire for the "particular sort of lawyerly assistance" (*McNeil, supra,* 501. U.S. at p. 178) addressed by *Miranda*—courts typically apply an objective inquiry. (*Davis v. United States* (1994) 512 U.S. 452, 459 (*Davis*) [in post-waiver context, whether a suspect

17

has invoked his right to counsel under *Miranda* and *Edwards* "is an objective inquiry"]; *People v. Williams* (2010) 49 Cal.4th 405, 428 (*Williams*) [objective inquiry applies to assessing whether suspect asserted rights at initial admonition stage].)  This is because, unlike the question whether a suspect's "waiver" of his rights was made knowingly and voluntarily—a question that involves an evaluation of the *suspect*'s state of mind—the question of the clarity of an asserted invocation of a suspect's *Miranda* rights "must include a consideration of the communicative aspect of the invocation— [i.e.] what would a *listener* understand to be the defendant's meaning."  (*Id.* at p. 428, italics added.)

A court considering "the communicative aspect" of an asserted invocation of *Miranda*'s right to counsel may determine the suspect's statement to be one of three things: (a) a clear and unambiguous communication of a current desire to have counsel's assistance during an interrogation (see, e.g., *Davis, supra,* 512 U.S. at p. 459), (b) an equivocal and ambiguous communication from which a listener could reasonably conclude the suspect might have a current desire to have counsel's assistance during an interrogation (see *ibid.*), or (c) a statement that unambiguously does *not* express a current desire to have counsel present during an interrogation (see

*McNeil, supra,* 501 U.S. at p. 178).[7]  In order for a court to conclude that a suspect has expressed an unequivocal and clear invocation of the right to counsel for *Miranda* purposes, the suspect " 'must articulate his desire to have counsel present [at the interrogation] sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney['s presence].' " (*People v. Cunningham* (2015) 61 Cal.4th 609, 646, italics added (*Cunningham*), quoting *Davis,* at p. 459.)  An ambiguous or equivocal invocation of *Miranda*'s right to counsel, on the other hand, is one for which " 'a reasonable officer in light of the circumstances would have understood [to signify] only that the suspect *might* be invoking the right to counsel' " (*Williams, supra,* 49 Cal.4th at p. 428, italics added, quoting *Davis,* at p. 459) for purposes of custodial interrogation.  It is self-evident that a statement that does not meet either of

---

7    The significance of the distinction between an ambiguous invocation of *Miranda*'s right to counsel and a clear and unequivocal invocation is relevant in the context of *when* in the interrogation process the asserted invocation has occurred.  Only a clear and unequivocal invocation of either of the *Miranda*-based rights (i.e., the right to remain silent and/or the right to the assistance of counsel at a custodial interrogation) is sufficient to stop an interrogation that is taking place after the suspect has waived his *Miranda* rights.  (See, e.g., *Davis, supra,* 512 U.S. at p. 459 [post-waiver invocation of *Miranda* right to counsel must be clear and unambiguous]; *Berghuis v. Thompkins* (2010) 560 U.S. 370, 382 [post-waiver invocation of *Miranda* right to remain silent must be clear and unambiguous].) Although the United States Supreme Court has not set out a different standard when a suspect ambiguously invokes the right to counsel after being advised of his *Miranda* rights but before waiving those rights, the Ninth Circuit Court of Appeals concluded in *Rodriguez, supra,* 518 F.3d at page 1080, that a different standard applies when a suspect has been admonished with the *Miranda* warnings but has not yet waived those rights.  In such a circumstance, a suspect need not make a clear and unambiguous invocation in order to stop the interrogation; rather, an ambiguous invocation is enough to limit the officer to asking questions meant only to clarify whether the suspect intended to invoke his *Miranda* rights through the equivocal statement.  (*Ibid.*)

19

these standards is, necessarily, not an invocation of *Miranda*'s right to counsel. (See *McNeil, supra,* 501 U.S. at p. 178 [request for the assistance of attorney at bail hearing is not an invocation of *Miranda*'s right to an attorney].)

Hartwell does not argue that his reference to "my lawyer" was an unambiguous invocation of his right to counsel. Rather, he asserts it was an *equivocal* invocation of the right to have counsel present at the interrogation. Hartwell contends that under *Rodriguez, supra,* 518 F.3d at page 1080 and *Duff, supra,* 58 Cal.4th at page 551, when a suspect ambiguously invokes his right to the assistance of an attorney during a custodial interrogation before that suspect has waived his *Miranda* rights, the officer conducting the interrogation has a duty to clarify the suspect's ambiguous invocation or stop the interview.[8] We reject Hartwell's reliance on these authorities however, because we do not agree that his reference to a lawyer constituted an ambiguous invocation of his *Miranda* right to an attorney.

Again, an invocation of one's right to an attorney for *Miranda* purposes must reflect a suspect's desire to have the assistance of counsel in dealing with a custodial interrogation. (*McNeil, supra,* 501 U.S. at p. 178.) Hartwell's statement did not reflect such a desire. Hartwell began by complaining about being arrested and being made to wait for hours without

---

8       Hartwell contends that the California Supreme Court adopted the *Rodriguez* rule for pre-waiver ambiguous invocations of *Miranda*'s right to counsel in *Duff, supra,* 58 Cal.4th at page 551. However, we read *Duff* as merely assuming the *Rodriguez* rule applies, without formally adopting it. (See *Duff,* at p. 554; see also *People v. Flores* (2020) 9 Cal.5th 371, 424, fn. 15 [explaining that in *Duff* the Supreme Court "acknowledged the Ninth Circuit's ruling in *Rodriguez* without expressly approving or rejecting it"].)

being told what was going on.[9]  Mills, in response to Hartwell's complaints, took the conversation in a different direction by engaging in small talk and offering Hartwell food and coffee.  Mills then asked Hartwell some basic biographical information, including Hartwell's birthdate.  As Mills was repeating Hartwell's birthdate back to him, Hartwell then said the words on which he is relying as constituting an invocation:  "Yeah [that is my birthdate].  'Cause, yeah, I was, I was getting pissed dude to where I was gonna,— the other guy was kinda rude and I was gonna tell him like dude, if you guys can't tell me why I'm here, if I'm getting arrested, then I'm gonna call my dad so I can call my lawyer just to get the fuck out of here, then you guys can let me know.  I was getting frustrated dude."  Hartwell's words, in context, involved him recounting his prior complaints about how he had been treated and how he was feeling/what he had been thinking *when he was arrested*.  Hartwell's use of "was gonna tell," specifically, expressed that he was narrating a *past* intention or plan that he had later abandoned.  Hartwell's comments cannot reasonably be understood to have been communicating to Mills that he had a then-current desire for the assistance of an attorney *at the interview*.  Rather, a listener would have understood Hartwell to be conveying a story of what he had been thinking in the past.

Moreover, Hartwell's comments also cannot be reasonably understood to have conveyed a specific desire "for the particular sort of lawyerly assistance that is the subject of *Miranda*" (*McNeil*, *supra*, 501 U.S. at p. 178).  Hartwell's previously abandoned plan was not to ask for an attorney to assist him in dealing with police questioning, but instead was to "call [his] dad so

_____

9      For example, Hartwell can be heard complaining that he was left "sitting in the car for about two hours and then get here and it's the same shit."  He then said, "I just wanna know what's going on."

[he could] call [his] lawyer . . . *just to get the fuck out of here.*" By this, Hartwell expressed that he had been thinking of calling a lawyer to help get him released from custody, not to assist him with any future interrogation. Thus, no reasonable listener would have understood Hartwell's statement about calling his dad to call his lawyer to be suggesting that Hartwell was, at that point in time, thinking of calling his father to obtain an attorney for the purpose of assisting him with police interviews.

As a result, Hartwell's reference to a lawyer would not have put a reasonable officer on notice that Hartwell might have wanted an attorney present during the interrogation. (See *Williams*, *supra*, 49 Cal.4th at p. 428.) It therefore cannot be viewed as constituting either an unambiguous *or* an equivocal "expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." (*McNeil*, *supra*, 501 U.S. at p. 178.) For this reason, the trial court correctly declined to suppress Hartwell's statements made to Mills after Hartwell made a reference to having thought about calling his father to call an attorney during the pre-interrogation portion of the interview in question.

B.      *Hartwell's Claim of Prosecutorial Error Has Been Forfeited, and He Fails to Establish Ineffective Assistance of Counsel*

Hartwell complains that the prosecutor committed prejudicial prosecutorial misconduct when she had a witness read aloud from and displayed on a projector a copy of an apology letter Hartwell had written, without redacting a portion of the letter in which he mentioned that during one of the crimes he had told the victim he had a gun. According to Hartwell, the prosecutor's showing of this portion of the letter violated a court order prohibiting the prosecution from telling the jury that Hartwell had told the victim he had a gun during the burglary of this victim's home.

22

1.  *Additional relevant background*

By pretrial motion, the prosecutor moved to admit evidence of Hartwell's prior convictions, obtained through a plea agreement, under Evidence Code section 1101, subdivision (b).  The trial court agreed to take judicial notice of the existence of Hartwell's prior convictions in order to assess the motion, and concluded that evidence of his convictions for those offenses was admissible because the offenses were sufficiently similar to the charged offenses to prove identity, intent, and a common plan or scheme.  However, the court was "a little concerned" that one of the prior convictions was for a robbery, even though it had been based on a similar entry into an occupied residence, but no robbery had been charged in the current case.  The court determined that it would allow the prosecution to use the fact of Hartwell's prior convictions, but would prohibit the prosecution from referring to a statement Hartwell had made to that victim during the commission of the crime about having a gun, which was the conduct that formed the basis for Hartwell's plea to a robbery.  The court instructed the prosecutor to admonish witnesses not to comment on the statement about the gun, and not to ask any questions that would elicit a reference to Hartwell's gun comment to the victim during the crime.  The court also indicated that a proposed stipulation to be read to the jury "avoid[ ] any notion that [Hartwell] threatened anybody with a gun or even has a gun because that could be very inflammatory."

At trial, the prosecution generally presented evidence regarding Hartwell's prior convictions in accordance with the trial court's ruling.  The prior victim was not asked about and did not discuss Hartwell's reference to a gun in connection with the prior conviction for robbery.  Nor did the arresting officer refer to Hartwell's comment about having a gun.  However, after

23

testifying about arresting Hartwell and Hartwell's admissions in connection with the prior convictions, the officer testified that Hartwell wrote an apology letter to the victim while being held in jail.  The prosecutor requested that the officer be permitted to read the letter to the jury, and defense counsel expressly declared no objection to the letter being read aloud.  Defense counsel requested, however, that the letter be published on the overhead projector.  The prosecutor agreed, and the court allowed use of the overhead projector.  As the letter was projected for the courtroom to see, the officer also read it aloud, as follows:

> "I write you this letter to show how sorry and misguided I've been. It was a stupid act of mine and very regret[ ] it. I was only trying to commit my son and sign him for—up for baseball. If I had and way to bring it back or find another way to put my son up for baseball. It was stupid and not smart. I hope you can forgive me and understand I didn't mean to hurt anybody or try to. P.S. I'm sorry for saying I had a gun, but you were a fast runner. Please accept my apologies and I hope you get you personal property back, please. And again, I'm sorry."

Defense counsel registered no objection during or after the reading of the letter.

Later that day, outside the presence of the jury, the trial court noted that "the gun comment . . . came in through the apology letter," despite the court's efforts to keep it out of the jury's knowledge.  The court said that what occurred "did not make me happy, but . . . in the big scheme of things, it probably doesn't have much impact.  I don't imagine either one of you is going to emphasize this.  So let's just make sure it doesn't happen [again].  I'm assuming we're not going to hear about that case any more."

The prosecutor apologized and stated she had forgotten that Hartwell had mentioned his comment about the gun in his apology letter.

2. *Analysis*

"The standards governing review of [prosecutorial] misconduct claims are settled. 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " [Citations.] Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial." (*People v. Friend* (2009) 47 Cal.4th 1, 29 (*Friend*).) Given that these standards are objective, "the term prosecutorial 'misconduct' is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial 'error.' " (*People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)[10]

"[W]hether done intentionally or not" (*Friend, supra*, 47 Cal.4th at p. 33), a prosecutor commits prosecutorial error by "eliciting or attempting to elicit inadmissible evidence in violation of a court order" (*People v. Crew* (2003) 31 Cal.4th 822, 839).

However, to preserve a claim of prosecutorial error, a defendant generally is required to register an objection in the trial court and request that the jury be admonished to disregard the alleged impropriety. (*People v. Centeno* (2014) 60 Cal.4th 659, 674.) Here, Hartwell's counsel registered no objection to the admission of the apology letter, and instead requested that it be displayed to the jury on an overhead projector. Even after the offending

---

[10] Consistent with *Hill, supra*, 17 Cal.4th at page 823, footnote 1, we will refer to the issue raised here as involving "prosecutorial error," rather than "prosecutorial misconduct."

words were read aloud, defense counsel said nothing. The absence of an objection forfeits this argument on appeal.

Hartwell concedes the forfeiture of his claim, but contends that this court should exercise its discretion to consider his claim because, he asserts, the error alleged was so prejudicial that it infected the trial with unfairness. Alternatively, he argues his trial counsel provided ineffective assistance by failing to object to the gun comment being brought in through the apology letter. We disagree with his assessment of this prosecutorial error and the contention that trial counsel rendered ineffective assistance in connection with it.

First, contrary to Hartwell's assertion, the prosecutorial error at issue here did not infect the entire trial with such unfairness that it requires review despite the lack of an objection at trial. While Hartwell contends that the "difference between the verdicts at the first and second trials" demonstrates " '*almost to a certainty* the prejudicial nature of the error,' " it is simply untrue that the only difference between the two trials was the fleeting reference to the fact that Hartwell had apologized for telling the victim of one of his prior crimes that he had a gun, such that the different outcomes necessarily resulted from this error.[11] We also reject the notion that the failure to redact Hartwell's statement "P.S. I'm sorry for saying I had a gun, but you were a fast runner" rose to the level of a federal or state constitutional violation. The statement was, in fact, so minor and

---

[11] In fact, Hartwell effectively concedes that this was not the only purportedly meaningful difference in the trials. He also argues on appeal that the inclusion of the recording of his statements to Sergeant Mills in his second trial, as opposed to his first trial where only the written transcript of the interview was admitted, was a prejudicial error based on the different outcomes of the two trials.

inconsequential that defense counsel raised no concern either prior to the admission the letter or after it had been read aloud and projected on screen. In addition, despite Hartwell's contention that any reference to a gun was unduly prejudicial, the statement from Hartwell's apology note implies that he had told the victim he had a gun when in fact had not been in possession of a gun. Such a comment, implying the *lack* of a gun, was unlikely to have evoked an unfair negative emotional bias against Hartwell. (See *People v. Robinson* (2005) 37 Cal.4th 592, 632 [evidence is considered prejudicial if it predominantly tends to evoke an emotional bias while having only slight probative value to the issues].)

Hartwell's ineffective assistance of counsel claim similarly lacks merit. To establish such a claim, a defendant must show both that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that counsel's deficient performance resulted in prejudice; that is, there is a reasonable probability that, but for counsel's failings, defendant would have achieved a more favorable result. (*People v. Bell* (2019) 7 Cal.5th 70, 125.) Whether counsel's performance was deficient, and whether the complained-of deficiency prejudiced the defendant, are mixed questions of law and fact subject to an appellate court's independent review. (*In re Gay* (2020) 8 Cal.5th 1059, 1073.)

In considering whether an attorney's representation fell below an objective standard, we accord great deference to counsel's tactical decisions and presume that counsel's actions were reasonable and can be explained as a matter of sound trial strategy. (*People v. Mickel* (2016) 2 Cal.5th 181, 198; *People v. Lewis* (2001) 25 Cal.4th 610, 661.) Because of the great deference accorded to trial counsel's tactical decisions, counsel's failure to object rarely provides a basis for finding incompetence of counsel. (*Lewis,* at p. 661.) We

therefore will reverse a conviction based on ineffective assistance grounds only if there is affirmative evidence that counsel had no rational tactical purpose, was asked for a reason and failed to provide one, or there could be no satisfactory explanation. (*People v. Hoyt* (2020) 8 Cal.5th 892, 958.)

These standards have not been met. The record readily provides a rational tactical purpose—and thus a satisfactory explanation—for counsel's decision not to object when Hartwell's apology letter was read and visually displayed while still including the line in which he specifically apologized for saying he had a gun. The reference was fleeting and so minor that an objection would have likely served only to highlight the reference to a gun. And this is particularly so given the fact that Hartwell's apology seemed to imply he had not actually been armed with a gun. Counsel could have reasonably concluded that not drawing additional attention to the gun comment was the best course of action. (See *People v. Catlin* (2001) 26 Cal.4th 81, 165 ["decision whether to object, move to strike, or seek admonition . . . is highly tactical, and depends upon counsel's evaluation of the gravity of the problem and whether objection or other responses would serve only to highlight [it]"].)

This, alone, undermines Hartwell's ineffective assistance of counsel claim, but we also conclude there is no reasonable probability that, but for counsel's failure to object to the gun reference and/or ask for an admonishment, Hartwell would have achieved a more favorable result. Again, Hartwell's apology about saying he had a gun implied he did not actually have a gun during the offense. Thus, from this statement alone, which was the only evidence about a "gun" mentioned, jurors would have drawn the conclusion that Hartwell did not in fact have a gun during his prior offense, diminishing concerns about potential prejudice from references

28

to use of a gun in the commission of the prior offense.  In the context of the entire trial, the passing reference to Hartwell's apology for saying he had a gun was so inconsequential that counsel's decision to allow it to pass without objection could not have had any effect on the outcome.

## III.

## DISPOSITION

The judgment is affirmed.

KELETY, J.

WE CONCUR:


McCONNELL, P. J.


CASTILLO, J.

29